Good afternoon and may it please the Court. My name is Tracy Staub and I'm here on behalf of my client Mr. Martinez. There are two issues presented in our brief. One of them concerns the Fourth Amendment and a warrant that was issued and whether the search of a storage unit rented by Mr. Martinez could be searched under a search warrant which contained no evidence that the search warrant was used by Mr. Martinez. The second issue relates to... Wait a minute. I didn't get that argument. My thought was once you know he's a dope dealer and you find all this dope in his house and you find out he's got a storage locker, you'd be amazed if he didn't have more dope in his storage locker. All you need is, what is it, reasonable cause? I can't remember the exact buzz word. Fair probability. Fair probability. Fair probability to believe. Well, Your Honor... If I were a cop searching the storage locker and I didn't find dope, I would think, boy, I must be getting lazy or not looking hard enough. And here's, I think, one of the issues on that. There is case law out there, there's significant case law out there that says just because you have reason to believe that this person has committed the crime doesn't mean you have reason to believe that everything that this person owns or has had contact with may have criminal evidence of a crime in it. I agree, but a storage locker is such a great place to store stuff away from your house. I realize that, but in this case they had covert surveillance of this guy going back and forth and back and forth and back and forth. Never once had any indication that he had any connection to the storage unit. But was there not the boilerplate, you know, I know that drug dealers frequently... or a storage locker or a safe house. And what's wrong with an agent including that kind of, I'll call it precatory language in the affidavit, when he's entitled to rely on his experience as a law enforcement agent and he now knows from the search of this drug dealer's house that he's already recovered a significant amount of incriminating evidence. As I understand your argument, I guess he could never get a search warrant for the guy's car unless that he could show a nexus that the guy had actually used his car and was sitting in the front yard. Well, a nexus that there would be a fair probability that evidence of a crime... How is the fair probability any less than a warrant that they might have obtained for the search of the car sitting out in the garage? Well, and the search of the car is obviously going to be spatially much closer and more accessible and maybe used more often. I don't know. I don't get this. It seems like I wasn't impressed with the policeman's boilerplate any more than you were. I mean, they say because they're experts, they can say the earth is round and goes around the sun. It didn't mean much, but I'm thinking if I have valuable inventory, sure, I'm going to put it in different places. Just like if you're writing a Ph.D. thesis at home, you probably want to email it to yourself and you want to make a CD backup and get it somewhere out of your house. So if there's a fire or you have a fight with your boyfriend or girlfriend, whatever, you don't lose your thesis. I understand that, Your Honor. It's valuable inventory. It is. But here's the crux of it, I think, when it boils down to it, is it's reasonable. If I were a police officer and I just arrested this guy and confiscated the drugs in the house and the cash in the house, if I wanted to find more evidence of this crime or this criminal, it would be reasonable for me to assume, hey, what else does he own? Who are his friends? Where do they live? All of these things. But a search warrant is supposed to be based on probable cause. And the last time I checked, probable cause is still more than reasonable suspicion. So the officer had reasonable suspicion to believe that this might contain evidence of a drug, but that is less than probable cause. And he has nothing beyond just the fact that this guy has a key. A lawyer has files in his office. Some of them are closed cases, but very important files. And the files in his office eventually get shredded, as files in the office do, to avoid payment for the space. There's some real need for the dead file. And the lawyer has a storage locker. Wouldn't the lawyer or his heirs or whoever has an interest think, gee, pretty good chance we'll find that file or a copy of it or a microfilm of it or CDs of the documents from it in a storage locker? That would be a reasonable assumption, yes. I don't know that it would be a probable cause assumption. You don't need more probable than not, though, for a search warrant, do you? I know. And that's a ‑‑ that's a ‑‑ You're trying to make, I guess, probable cause a specific requirement with regard to every location. There's clearly probable cause at this point to believe that the defendant is engaged in drug dealing. Yes. Then once that is established, then doesn't our case law basically say all the magistrate judge need be convinced of is that there is a fair probability that incriminating evidence relating to drug dealing will be found in the place to be searched? That is true. But where does ‑‑ where does that stop? I mean, like I mentioned earlier, if I were a police officer investigating this case, I'm looking at his friends, his friends' houses, his friends' cars that he's ridden in. You know, if I were truly to investigate this, I would start digging around there, too. But what's the stop? The problem with the friends is that they have an independent expectation of privacy protected by the Fourth Amendment. Here we are dealing with a storage locker which, according to the ownership papers, is his. Well, Your Honor ‑‑ It's his property. It is privacy that's being invaded. If you look at Zurich v. Standard Daily, which is a 79‑78 Supreme Court case, it's 436 U.S. 457 ‑‑ 547. Sorry about that. Anyway, what the Supreme Court says in that case is that the probable cause to search a place is entirely unrelated from the person. So, you know, when you say that the friends have an independent right, they do. But we have clearly upheld search warrants of a friend's house if there's probable cause to believe that evidence of his friend's crime is there. So why is this any different? If it's ‑‑ if the place to be searched is ‑‑ Right. Okay. And why is it not fairly probable that there is a nexus between now a known drug trafficker for whom incriminating evidence has been located in his home to believe that he might also be hiding it in his storage locker? Well, and one of the things that's noticeable about this case is when they went in there and they found the drugs and they found the cash, they didn't have any reason to believe that anything was missing. They didn't scratch their heads and say, you know, we're missing a whole bunch of drugs and cash here. We've got to go start looking around for other things. Why do they have to assume that he's going to keep it all in one place? They may not. But, again, we've got to make the distinction between reasonable suspicion and probable cause. And they don't have anything. They're not missing anything. And they're not looking for anything. They have nothing to suggest that anything other than a hunch or speculation or a guess that, hey, he might be storing stuff in this storage locker. It's conjecture. To stop you down to a minute and a half, I hope you spend a little bit of time on your sixth amendment. That's a good one, isn't it? The right to fire, Mr. Martinez made a very clear request to fire his counsel. And he made it at the sentencing hearing. And the judge kind of talked him out of it and said, you know, why don't you spend some more time with your attorney. And then he came up at the meeting. Counsel, I studied that colloquy. That issue troubled me more than the other one, frankly. And I studied it. And it didn't look to me like the judge trying to talk him out of it. It looked like the judge trying to find out what the problem was. And then when I listened to your client talk about what the problem was, it sounded like basically the problem was his client would not tell him exactly how much time he was going to get if he pleaded guilty. And, well, that's tough. In the federal system, you can't tell your client exactly how much time he gets if he pleads guilty, unless you get an E1C agreement, which hardly anyone does. I know. But if you look at Gonzalez-Lopez, and in the footnote, I think it's footnote 4 in that decision where Alito talks about or not Alito, Scalia talks about, look, we're not going to go into the quality of representation. It's his choice. He can choose to go pro se, even though we all know that's not a good decision. We don't second-guess his decision on who is going to represent him. So there's a difference between the Sixth Amendment right to appointed counsel, there's a right to conflict-free counsel, and there's a right to counsel of choice. And I think the parties are mixing them all up. What the Court was focusing on was whether there was a conflict. Did the judge actually make a ruling on the request? No. The judge on which request, Your Honor? Well, I suppose the last one, you know, where I think he kind of renewed it, didn't he? Yes. The attorney got up and tried to renew it, and the judge shut it off right away. And then when the defendant was given his first opportunity to speak, he tried to raise it again, and the judge interrupted him and said, no, I've ruled on that. We're moving on. So I sort of have the impression that the motion was never really ruled on, so we don't know. Well, the judge definitely denied it at the second hearing. I mean, he denied it without any weighing, without any discussion. He denied it at the second hearing, then when your client brought it up again in sentencing, basically the judge said, I've ruled. When you say the second hearing, which hearing is that? Pardon? The sentencing hearing on March 21st. March 21st? Yes. You brought up Ferretta. I don't think your client ever asked to represent himself. I think he just said he wanted a change of lawyer, didn't he? Right. Well, he said, I wanted to get rid of my lawyer, and that was really never discussed on the record. He never said he wanted to represent himself. No. No. But, again, you know, I agree that he got great representation. The lawyer puts it clearly. He says he would like new counsel. He would like new counsel. So I don't really see where Ferretta and that line of cases have anything to do with anything. Other than the fact that we don't get into the decisions about, you know, whether his decision to get new counsel is a good decision or a bad decision. We just don't second-guess that. It's his decision. Well, we can second-guess it as long as we get the district judge applied the factors. Yeah. One of which he did mention, which is, look, we've already continued this thing once. Right. But then the problem is that, I mean, the whole sentencing hearing took 21 minutes. There were no witnesses. There were no additional documents. What would it have taken to set it over and say, look, now you need to get new counsel by such and such a date? He raised it at the time that he could at every point in time. So, you know, he's trying to do this. And the judge says it was untimely. Is it your position that the inquiry, to the extent that there was one, was you don't have anything more to add other than the fact that your client was dissatisfied with his representation because he was frustrated by the fact that his lawyer couldn't tell him how much time he was going to get? Right. Right. So if we send it back, what are we going to do? We're going to ask the court to hold, A, to give him a new, well, he has a new lawyer. He's got you. Okay? Right? Well, I wouldn't represent him at the trial court. They don't let me out. They don't let you do that. No, just the appellate court. Okay. That's fine. In any event, we would send it back, and the court would presumably allow him to come in with a new lawyer and resentence him. Maybe. And maybe he would move to withdraw his plea. We don't know that. And that's a possibility. Of course, if you grant my first issue, then resentencing would be much more interesting. He got, I think, he appeared for sentencing, if I remember correctly, a total of three times, and twice he got it continued. Was it just two times? Just two times that I'm aware of. Just two times. His lawyer was privately retained, Mr. Trejo. I don't see, if he wanted a new lawyer, why he couldn't have just fired Trejo and hired a new lawyer? He didn't need the court to do anything for him. Well, Your Honor, I think that, I think part of the problem was Mr. Trejo, according to Mr. Martinez, wouldn't come in and talk to him. So the only time he saw his lawyer was right before. So he could fire him and get another one. He tried. And Mr. Trejo got up and said, my lawyer, my client wants a new attorney. And the court said no. No, I mean, that's not how you try to get a new lawyer, is by asking the judge. If it's privately retained counsel, you don't have to ask the judge. If it's private counsel, when I did criminal defense, I'd get calls from the jail. Will you represent me? And I agree. Well, he does need the approval of the court, right? Well, no, he doesn't need the approval of the court, but I think that they approached it and said, you know, Mr. Trejo came up and said, my client wants to fire me. And the court said no. Well, the first time the court said, Mr. Trejo, go talk to your client, see if you can work this thing out. And then the judge doesn't hear anything until the day that he's set for the second sentencing hearing. Right. No motion in the interim, no firing of Trejo in the interim. Instead, it's the same lawyer showing up with the same defense. I know, but if you're a Mexican national and you're sitting in jail and your client, yeah, and your attorney's not making your phone calls, his calls were blocked. Well, I mean, he was talking to him on the day of the first thing. He could have said to him very clearly if he'd wanted to, on that date, you're fired. But he didn't. He could have also just called another lawyer and the other lawyer, the new lawyer, could have prepared a substitution of counsel. And the new lawyer could have gone to Trejo's office and said, my client wants me to replace you. Could you sign this form? Trejo would have no choice. You know, these are really good possibilities. And the problem is that none of this was brought up on the record, so we don't know. Well, sure you know. You don't need the record to show you that a privately retained lawyer can be fired by his client and replaced by another lawyer. But I know that. But we don't know if he knew that. It doesn't matter if he knew it if that's plainly the law. Okay. My time is up. I'm not sure if it's the law if the judge doesn't let him do it, which seems to have happened here. I mean, I really don't think the judge ruled on, you know, he sort of made a motion, I want a new lawyer, and he said, well, you talked to your lawyer, and, you know, they came back and said, well, I want a new lawyer. He says, I ruled on that last time. And he never really ruled on that. Well, he said it was on. He said it again. He says, no, I'm not going to address that again. I told you I already denied that. So I think the defendant was under the impression that he had to get the judge's approval before he could change lawyers. And the judge gave him the impression. And the judge didn't say, we're going to have a status conference in the interim to see if you're satisfied with your lawyer, you know, anything like that. Just the next hearing, this first thing out of the guy's mouth is, I want a new lawyer. So thank you, Your Honor. Thank you, counsel. Please, the Court. My name is Jim Hegarty. I'm an assistant United States attorney in the Eastern District of Washington, and I, in fact, am the assistant U.S. attorney who handled this matter with Mr. Trejo. Mr. Hegarty, I'm speaking only for myself, but if you would address yourself to the last issue, I'm far more troubled by that issue than I am by the first. I think the bottom line in this is the defendant in this case did nothing. He did nothing. If you read the record, and I was trying to find it real quick and didn't want to pause, but at no time did the defendant ever say, I want to fire my lawyer. So let's clarify the record. There was no request to fire my lawyer. Firing, and I think the Court has pointed this out, is to fire a lawyer doesn't take the court's permission to do that. You call up another lawyer, you hire him, and you tell the other lawyer, you're out. You're gone. He didn't do that. During this period of time. Wait a minute. Here's what he said at the hearing. He said on the 21st, on page 66, he says, well, Your Honor, with all due respect, what I would like to say about Mr. Trejo is that he should be replaced. He said that, and then the judge says, well, I've already ruled on your request. Correct, Your Honor. What he doesn't say is I want to fire Mr. Trejo. He doesn't have to use magic words. You know, I mean, it's pretty clear what he means with that. He should be replaced. He wants the court to appoint him a lawyer. He didn't say that. But he says, Mr. Trejo says in the original hearing, my client wants a new lawyer. Right. He doesn't say he wants to fire me and hire another one. He says he wants another lawyer. He doesn't say he wants you to appoint him. Right. He says he just wants another lawyer. What are you doing? Construing all the ambiguities against the defendant? I was present, and the whole thing was, and I think the real issue here. You didn't clarify for the judge. Judge, why don't you ask him whether he's ready to, you know, retain him or he wants an appointment? What happens is under those situations is we are removed from the courtroom, and the court meets with the defendant and the defense counsel. But you weren't there. We are removed. So I have, as I indicated in my response, when the first time that I find out any of the contents of what occurs in that meeting is when the sealed transcript of that meeting between Mr. Martinez and Mr. Trejo and the judge occurs. We see it for the first time. We're not present. So whatever goes on in there, we have no idea. So if he's raising the issue about I want to get one appointed, I want to be fired, these are the reasons, we have no idea because we're not a party to that meeting. So we can't, we're really in no position. So you're just as much in the dark as we are. Well, other than I was there when Mr. Trejo got up and said my client wants a new lawyer. Well, how do you distinguish our case law? I'm looking specifically at U.S. v. Franklin that talks about the three factors that the court has to consider when there's a request to substitute counsel, one of which is timeliness. And clearly Judge Nielsen was concerned about the fact that here he thought it was untimely, the way this thing had played out. But secondly, he's got to conduct some kind of inadequate inquiry in order to figure out what the problem is. And then third, determine whether or not there's a conflict between the lawyer and the client. And what's your position with regard to whether he met the last two factors? The first one is the timeliness. That's the true basis of I think what he said. Clearly it's late. Correct. But our case law as I read it doesn't, that doesn't answer the question. That is a factor to be considered, but it's not dispositive. Correct. But I think that's what the judge was saying is that having considered the fact is you had a suppression hearing, you had a change of plea hearing, this matter has been penned, you filed a sentencing memorandum, here we are the day of sentencing, the day that was set 70 days down the line, and today you walk in and say I want a new lawyer. I think that's what the court focused on. Forget about the first factor. Okay. He's clearly late. But what did the court do to satisfy our case law on inquiries two and three, the adequacy of the inquiry and the extent of the conflict that had arisen? I think he asked Mr. Trejo the nature of that. I think that's what happened in my presence. He didn't have to defend in anything. Then he goes into the inquiry where we're not present and he goes through this thing. I think the answer is we're not. He goes through this thing. He goes through the hearing with Mr. Trejo and the defendant and talks about. And he talked to the defendant and not just Trejo. The defendant and Mr. Trejo were present at that first hearing about what. He talked to the defendant and not just Mr. Trejo. I believe the transcript reflects that he did talk to the defendant during that period of time. I thought he told him he didn't want to hear any more about it because he'd already ruled on it. That's the later hearing. That's the second hearing. Remember, the first hearing is on February 27th, I believe. That's the first hearing. That's when the defendant first raises. Mr. Trejo says my client wants a new attorney. And then they go through that and then we're removed. He has this meeting with Mr. Trejo, the defendant, and the judge. They sit down. And we have a transcript of that in the excerpts, right? I believe there is, Your Honor. And I'm sure you read them on your long trip. All we tell them at that hearing is, well, you meet with Mr. Trejo. And Mr. Trejo will explain everything to you. And then you come back and we'll see where you stand. Right? On the 21st. No, Your Honor. For reference to the record, at the excerpts of record, page 38 through 43, is the verbatim report of proceedings, sentencing one. This is the initial introduction of the case. Mr. Trejo gets up and says we have a problem. My client informed me that it regards the plea agreement as initial concern, dot, dot, dot. And he said, my client indicated he does not agree with the plea agreement. He didn't want to know we were signing. And so he's talking about what's going on. I know that, but when does he question the defendant? Then if you go to excerpt of record, page 44, and that goes through page 53 or 54, that is a transcript of the hearing which occurs between Judge Nielsen, Mr. Trejo, and the defendant concerning the issue raised. Nowhere there does he question the defendant. Firstly, he just says you talk to Mr. Trejo and you come back on the 21st. That's all he tells him. The first thing he asks the defendant is how long has Mr. Trejo been your lawyer, Mr. Martinez, since June of this year, last year. You retained him. In other words, you hired him and paid for him. Yes, Your Honor. Have you met with him a number of times, two times? Does he go over to see you at the jail? Only one time. Have you discussed the case with him? Not until right now. Not until right now that I saw him. Well, we know that he had already met because we'd had a change of plea and a motion hearing prior to that time. So he's discussing that on page 45, 46, 47. He's talking in the transcript. He's talking to the defendant in this hearing. Again, I wasn't present. So basically you're saying that's adequate because the court could determine from that colloquy that the problem here was that Trejo was confused over the fact, according to Mr. Trejo, that when he signed the plea agreement, Trejo is now saying he thought he was just signing some papers for the appeal. So there's some confusion as to what the significance was. And then that he was upset because Trejo wouldn't give him a fixed number for a potential sentence. I can speculate only, and I will for answering yours. I'm going to speculate. Let me ask the question more clearly. Is it your position that that is adequate under Franklin in terms of the inquiry that was conducted? I think you have to look at why Judge Nielsen did that. I think he wanted to maintain the relationship because we were so far down the proceeding, so much had occurred, that what Judge Nielsen wanted to do was to see if there was a basis for the defendant and Mr. Trejo to continue the relationship so they could discuss the issues and proceed on to sentencing. So that's why he granted the continuance. Correct. But if there was a conflict, the client had lost confidence in his lawyer that they could somehow work that out between the first and the second sentencing. An attempt. Because if you read it, you see where Judge Nielsen says, well, Mr. Trejo, do you want to talk to your client now and can you come back? They come back, they have this meeting, and then we're called back in. We're going to continue this to allow Mr. Trejo the time to go see his client, talk about the issues, address all of this. So I think the inquiry that the judge is making is that he's trying to determine, one, the specifics of this problem, the concern the defendant has, which I think if you read the records, because they're paid ER 40, 50, and 67, the real thing that comes out is the defendant wanted to know how much time he would get. If Mr. Trejo had gone out on a limb and said to him, you will receive 70 months, we probably would not be here on this issue. Because at that point the defendant presumably had seen the pre-sentence report and saw the range that he was looking at. And he would have read the, he would have had the plea agreement that he signed that said what the government would recommend, what the recommendations would be. And so what was the range that he was looking at at that point? I mean, I didn't read in the transcript that the defendant basically didn't like the amount of time that he was facing, although maybe that's really what's going on. No, it's not the amount of time. It was the fact is that the lawyer would not tell him what the time was. And again, at ER 40, 50, and 67, there's a reference as the defendant has a problem because we can't tell him how much time he's got. So I think that was his real concern. Because the fact is he says one of his other concerns was I didn't know I was pleading guilty. I thought I was preserving my right. Well, there's a plea agreement wherein answering this plea of guilty is repeatedly stated multiple times. And you have this full-blown hearing where the judge is saying you know you're pleading guilty. And are you pleading guilty because you are? We're not concerned at this point about whether or not the plea was knowingly and voluntarily. We're assuming for the sake of this appeal that it was a valid plea. The question I'm wrestling with is was that inquiry adequate? Did the court make a determination that there was not an irreconcilable conflict between lawyer and client? And because of the untimeliness of the motion, did the court deny the motion for substitution of counsel and still somehow conform with Gonzalez, which I find to be a very troublesome case. If it is error, it's structural and we have to reverse it. And I disagree with the court. With the Supreme Court? Because that's not our fault. No, I disagree that this is a structural. Because if you read that case. Well, it's structural if we find that there was a violation of right to counsel. Isn't that what the Supreme Court said is structural error in Gonzalez-Lopez? But you have to remember that Gonzalez-Lopez deals with the wanting to hire a counsel and not. And then getting another counsel and he wants to do. This is the mirror, right? He has the counsel of his choice initially. Now he wants to fire him and replace him with somebody else. And the court doesn't let him do that. Then there's another counsel. And all of this occurs before trial. And then we go through this trial and he's convicted. And I think that's what distinguishes this case. Because remember, at this point in time, we're at sentencing. We're not at trial. And I think that on page. It talks about the. We look at the harmless error. And this is at page 2564. The second class is constitutional error. We call structural defect. Because it defies analysis by harmless error. Because they affect the framework within which the trial proceeds. And are not simply an error in the trial process. And in the footnote, it indicates in there. Rather, as we done, we rest our conclusion of structural error. Difficulty of assessing the effect of the error. And then it says we have little trouble. Because the consequences are necessarily unquantifiable and indeterminate. And unquestionably qualifies as structural error. And I would propose to this court. That we don't reach that level with this. Therefore, it is not a structural error. It is a typical constitutional error. Which is subject to harmless error. And what is the remedy? What is. If you remand this. We have to find that it is not a violation of his sixth amendment right to counsel. To terminate the lawyer he initially retained in order to replace him with another lawyer. Don't we? He's not denied counsel. He's denied the right to. He's not. Counsel of his choice. And his choice is not Mr. Trejo. But he doesn't. I read the record. The defendant doesn't indicate the trial. He just says he wants a new lawyer. He doesn't indicate that Mr. Trejo isn't the choice. He. He wants a new lawyer. How is that different from saying I don't want Mr. Trejo to represent me? Because I think that the fact is, is I agree. He should. Maybe he should. Maybe the judge should have. Whatever he wants it ain't Trejo. That I guess is how I'm reading this record. Right. But he doesn't do anything. You know, he can't sit back and wait for the last moment and say I want a new lawyer. And I'm going to hire. He doesn't ever say I want to hire one. I want time to get a hire. He has 70 days until the first day of sentencing. He has five weeks after that. And at no time during this period of time does he ever do anything but mention on the day, through counsel, I want a new lawyer. He makes no steps to replace the lawyer. He files no motions to replace the lawyer. He doesn't indicate whether he expects to retain or wants the court to appoint him. He takes no steps whatsoever to tell the court. So, you know, from that standpoint, I still will disagree that this is a structural error. I think we're carrying the right to counsel a little too far in the facts of our case, which occurred after all of this has occurred, that at this point in time the defendant is now saying is, well, I just said I want a new lawyer, so you should have, the judge, you should have gotten me a lawyer, you should have done everything. Mr. Hagerty, this may be further than you want to go. So what I hear you saying is there is no right to counsel of one's choice under these circumstances at sentencing because he waited too long. No. I think he has the right. I think he has the obligation that if you want. Something more than just say I don't like Mr. Trayl anymore. Right. That's my point, is it's not that he doesn't have the right to have counsel of choice at sentencing or any time during this process, but rather is if you want counsel of your choice, it is your affirmative duty, I believe, that you go out there and get it. And you had the time. You had brought it to the court's attention. The court asked you and you agreed as a defendant, you agreed to spend more time with Mr. Trayl to assume, to resolve what the court later found is that there was no conflict that was sufficient to allow you to be out. That's what I think the answer is. Anything from this? I guess we don't. From this record as to whether or not Mr. Martinez had funds sufficient to hire another lawyer, because he now has the federal defender representing him, which suggests. I know we had $10,000 of his money we took from his house, but I don't believe he could use that for a lawyer. And the money we got from the storage locker. Don't forget that. Or did you get any money out of the storage locker? No. We just found it.  Thank you. Thank you, counsel. Counsel, we've gone way over time with both lawyers, but it's kind of an interesting issue. If you want to take one minute, go ahead. I would turn your attention to ER 41. And this is the February 27th sentencing hearing, the first sentencing hearing. And Judge Nielsen, this is the very beginning, says Mr. Martinez, without going into details, I just want to ask you if for some reason you wish to relieve Mr. Trejo and hire a different lawyer. Is that your thinking? Yes. Let me explain. So then we close down the hearing. And the judge and Mr. Martinez and Mr. Trejo talk. And then the judge says, well, this is what we're going to do. We're going to set this matter over for a month, and you two are going to talk. And we come back at the 21st, and Mr. Martinez says, we didn't talk. I want a new lawyer. And the judge says, no, it's untimely. So that's essentially the case. What's your response to Mr. Hagerty's argument that your client had an obligation since the lawyer was retained to do something? I mean, he obviously knew enough to hire him in the first place. Your Honor, we really don't know whether he tried to make phone calls to get out. We don't know whether his family was hiring an attorney. We don't know any of these things because there was no record made of any of it. He could have made a record. He tried. The judge shut him down. And he doesn't know what record to make. He could have filed something. Through his attorney? The Gonzales. I'm wondering why we shouldn't distinguish Gonzales-Lopez because in that case, the defendant said, I want Mr. Lowe to be my lawyer. Lowe said, I want to represent Gonzales-Lopez. No problem there. The judge would not let Lowe do it because he had to appear pro hoc vice. That's how the court got involved. And the judge wouldn't let Lowe appear pro hoc vice because the judge thought he'd done something unethical. But in this case, in that case, the defendant did take the initiative and hire the new lawyer, and the judge wouldn't let the new lawyer appear for him. In this case, so far as the record shows, the defendant did nothing to hire a new lawyer, and the judge never did anything to stop him from hiring a new lawyer. Except for to suggest that we're going to just continue this over for a month so that you two can talk about it. And I understand what you're saying, Your Honor, but what if he had just said, I want to fire, and the judge had said, okay, if you fire your counsel, these are your options. You can go pro se, you can hire a new attorney, or we can appoint one for you if you qualify. Those are your options. Understanding your three options, do you still want to fire your attorney? And then he could have said, yes, and this is what I want to do. But that was never discussed. Thank you, counsel. United States v. Martinez is submitted. Thank you.
judges: Kleinfeld, Tashima, Tallman